FRANCISCO CINTRÓN-LÓPEZ, Plaintiff and Appellee, v. PROVIDENCIA ROMÁN, Defendant and Appellant.

No. 3979. Argued December 21, 1926.—Decided March 25, 1927.

*B. F. Pacheco* for the appellant.   *Enrique Campillo* for the appellee.

Mr. Justice Franco Soto delivered the opinion of the court.

Plaintiff in this case brought an action for divorce on the ground of cruel treatment and grave injury. Later the plaintiff amended his complaint and included another cause of action under subdivision 6 of section 131 of the Civil Code, praying for the annulment of his marriage with the defendant. In this cause of action the plaintiff alleged that the defendant had been divorced from her first husband, Armando Gautier, by a judgment which became final on September 14, 1919, and that on November 26, 1919, she contracted her second marriage with the plaintiff, or before the expiration of 301 days from the date of that judgment. Plaintiff also alleged that two years after the marriage "the defendant became pregnant and gave birth to their only child named Iris Hipólita."

The defendant answered by admitting the first allegation and filed a cross-complaint praying for a divorce on the ground of abandonment, cruelty and adultery by the husband. The defendant alleges in her cross-complaint, among other things, "that the cause of the desertion of the defendant by the plaintiff was that he fell in love with a woman named María Luisa Meléndez, widow of Santana, and they live as husband and wife at No. 207 Loíza Street, he passing as clerk or partner in a shop belonging to her."

In its opinion the lower court, although admitting as proved the facts set out in the cross-complaint, decreed the nullity of the marriage under subdivision 6 of section 131 of the Civil Code and the case of *Cabassa* v. *Nadal*, 23 P.R.R. 691. The trial judge seems to have been reluctant in coming to that conclusion because of the existence of a daughter born to the plaintiff and the defendant during their marital life

and after the expiration of 301 days following their marriage. The lower court said:

"We must state that at the trial the plaintiff withdrew his second cause of action, to wit, cruel treatment and grave injury, so that the only cause of action left for consideration was that regarding the nullity of the marriage.

"The court holds as proved beyond all reasonable doubt all the facts alleged in the first cause of action of the complaint. It also admits as fully proved all the facts alleged in the cross-complaint of divorce on the ground of abandonment and adultery.

"The court has considered carefully this case in view of the fact that out of the marriage of the plaintiff and the defendant a daughter was born named Iris Hipólita, now two and a-half years old, who is living with the defendant and who will suffer all the consequences of the unlawful acts committed by her parents. But the court is not empowered to amend the law in order to protect persons innocent of its violation. According to the law and the proven facts it appears that the marriage of the plaintiff and the defendant took place within the 301 days after the dissolution of the former marriage of the defendant. (Subdivision 6, Section 131 of the Civil Code.)

"From the foregoing, in compliance with sections 4, 129, 131, 178 and 179 of the Civil Code, and in view of the decision in the case of Cabassa v. Nadal, 23 P.R.R. 691, the court is compelled, in strict compliance with the law, to dismiss the cross-complaint and to sustain in all its parts the first cause of action of the plaintiff and therefore . . . . . ''

Section 131 of the Civil Code reads in part as follows:

"Section 131. The following persons are incapacitated to contract marriage:

\*     \*     \*     \*     \*     \*     \*

"6. A widow during a period of three hundred and one days after the death of her husband; or before a child is born, if she is pregnant at the time of such death; and a woman whose marriage has been declared null or has been dissolved, during a like period of time commencing from the date of such nullity or dissolution."

Section 45 of the Spanish Civil Code reads as follows:

"Section 45. Marriage is forbidden:

\*     \*     \*     \*     \*     \*     \*

"2. To a widow during a period of three hundred and one days

after the death of her husband; or before a child is born, if she is pregnant at the time of such death; and to a woman whose marriage has been declared null, during a like period of time commencing from the date of her legal separation.''

It will be noticed that said section 131 has followed literally the Spanish Code with the only difference that in the new code, after referring to the woman whose marriage has been declared null, the words ''or dissolved'' have been added, bringing it thus in harmony with the fundamental changes in matters of divorce as a result of the change of sovereignty. The reform authorizing the divorce *ad vinculum* had already been carried into effect by means of a judicial order approved by the military government on March 11, 1899, and which was later substantially incorporated into the Revised Civil Code adopted in 1902.

As to the facts on which is based the action of nullity there is no controversy between the parties. The defendant was divorced from her first husband by a judicial decree which became final on September 14, 1919, and forty-two days later she married the plaintiff. There is no argument either with respect to the birth from the marriage of the plaintiff and the defendant of a girl named Iris Hipólita who was conceived by the mother two years after the marriage, as is alleged by the plaintiff himself in his complaint. Any confusion is out of the question in respect to the paternity of the girl, because she was born after the 301 days mentioned in the prohibition of section 131, *supra*. Even any argument on a late pregnancy and childbirth that has been carried on by the schools in exceptional cases, could not even be considered here. If this is the case, what is the legal effect of section 131 under such circumstances? This statute has its origin in the Roman Law, and it seems to have been adopted by every civilized nation. In Rome a widow was not allowed to re-marry within the year of mourning. Manresa says in this connection: ''It is to be noted that the year of mourning

mentioned in the law was of ten months, according to Cicero and Seneca, as quoted by Escriche in his Dictionary, and this shows and supports what we have been saying, that the object of the precept has been rather to prevent *turbationem sanguinis . . . . . generationis aut seminis incertitudinem,* than, to have the woman keep the consideration and reverence due to the memory of the deceased spouse.'' Vol. 1, p. 253.

The old Spanish laws contained a similar prohibition for widows, with however one exception mentioned in the *Novísima Recopilación* which authorized widows freely to marry within the year following the death of the husband. The exception seemed to have been justified in order to increase the population perhaps decimated by war, but it gave rise to the great arguments that were raised between jurists and doctors to establish the paternity in doubtful cases. The rules that they tried to establish were always arbitrary and subject to presumption. The likeness to the parents, both physically and morally, was a circumstance that was offered as a basis to solve the difficulties, and likewise they applied other circumstances with the same purpose. Some argued that the child belonged to the two husbands or to none, thus cutting the Gordian knot. To put an end to this state of things the Penal Code of 1850 (section 400) punished the widow who married within 301 days after the death of her husband, etc. A similar provision was enacted in the Spanish Penal Code of 1870. And section 495 of the Penal Code which was enacted for Porto Rico on May 23, 1879, reads as follows:

''The widow who shall marry before three hundred and one days have elapsed from the death of her husband, or before she is confined, if she were pregnant at the time of his death, shall incur the penalty of *arresto mayor* and a fine of from 125 to 1,250 *pesetas.*

''The same penalty shall be incurred by a woman whose marriage should have been declared null and void if she should marry before her confinement or before three hundred and one days have elapsed from her legal separation.''

Groizard, the illustrious commentator on the Spanish

Penal Code, referring to section 490, equivalent to section 495, *supra,* says:

"This section also contains the sanction of a civil precept.

"Our legislation has not been consistent in regard to the time within which widows may marry. In the 'Fuero Juzgo', in the 'Fuero Viejo' and in the 'Partidas' they were prohibited from marrying within one year counted from the death of the first husband. The illustrious jurist Pacheco is not right when he says that the reasons for the prohibition was respect for the memory of the deceased husband. The visigothic code stated explicitly that the reason for such precept was to prevent the woman 'from killing the creature before it was born.' The Code of Alfonso el Sabio stated that 'the law forbade women to marry before that time for two reasons: one of them was that men should have no doubts, if she was confined within that year, as to which of the husbands, the deceased or the one alive, is the father of the boy or the girl born to her. The other is that the second husband should not suspect her because she wanted to marry so soon.'

"The *Novísima Recopilación* did not consider of much importance the said two motives to impose such prohibition on widows against their natural feelings and stimuli. It was in the right as regards the second; but not as to the first, because the legal and moral importance of avoiding confusion in the issue is sufficient reason to suspend for some time the right of the woman to marry a second time, a suspension which was not absolute." Vol. 5, p. 510.

The civil marriage law first, and then the Civil Code of 1885, repealed the *Novísima Recopilación* and re-established the spirit of the old law and it was thus from those precedents and principles that section 45 of the old Civil Code was enacted and passed in its letter and spirit into the Revised Civil Code.

Nothing could be found to show more plainly, from the historical origin of the precept, that its only object has been to fix a time within which a widow or a woman whose marriage has been annulled can not marry again in order to prevent confusion in the issue. As a logical consequence and in keeping with sound reasoning and the proper marriage status, it is not possible to sustain the nullity of a marriage between

the plaintiff and the defendant where all danger of confusion of issue has passed because more than double the time mentioned in section 131 had elapsed before the pregnancy of the defendant. If the consequences which the legislators tried to prevent could not possibly happen during the conception and birth of the child Iris Hipólita, the marriage between the spouses must subsist. If the cause did not exist, how could the effect take place? Marriage has a double character; of a contract and a status. In respect to the latter the state has a great concern and the power to control the personal relation springing therefrom. That is why the state steps in by establishing the rules governing the contracting parties. Sections 130, 131, 132, 133, 134 and 135 of our Civil Code provide various rules in that respect. They establish the different cases of incapacity to marry. But not all the cases produce the same effect if the parties marry in spite of the legal prohibitions. While in some cases the marriage thus contracted is void *ab initio,* in others it is only voidable. This theory had been held in *Just* v. *Just et al.,* 32 P.R.R. 229, in construing sections 130 *et seq.* of the Civil Code in an action brought to void a marriage on the ground that the husband was not only impotent but mentally deficient, and where among other things this Supreme Court said:

" . . . . . It would follow that impotence is not a lack of legal capacity, but only a special incapacity like minority or other matters treated in section 130 *et seq.* Legal capacity must then mean the capacity the absence of which would render marriage void *ab initio* . . . . .

"We are inclined to hold, without more, that a contract of marriage merely voidable may be continued or ratified by the acts of the parties, provided they are *sui juris,* as intimated in our original opinion . . . . .

"Looking again at sections 130 *et seq.,* it will be seen that the incapacity referred to will sometimes make a marriage void *ab initio* and at other times merely voidable. By specific provisions therein parties in certain cases may ratify the marriage or renounce their rights. A minor who marries without the consent of his parents

may ratify the marriage on coming of age. The pupil, too, who marries her tutor before his accounts have definitely been approved, etc., may likewise ratify when she comes of age. In the case of *Ledesma* v. *Agrait,* 19 P.R.R. 549, we similarly held that the provisions of section 1362 permitted the ratification of contracts which observed the external form of section 1228.''

Therefore, it will be seen that in the case of a marriage void *ab initio* the marriage is inexistent, has never existed and does not produce civil effects. A clear example of such supposed marriage is that contracted between cognate ascendants and descendants. A voidable marriage is valid so long as it is not judicially declared void. In 38 C. J. 1280-81, in connection with the effect of either marriage, it is said:

''Where an essential which the law makes pre-requisite to the validity of a marriage is wanting, the purported marriage becomes void or voidable, that is to say it becomes invalid *ab initio* or merely potentially invalid *ab initio*. Where an ostensible marriage is void *ab initio,* no civil rights can be secured thereby, and it may be inquired of in any court where rights are asserted under it, and after the death of either or both of the parties. Where, however, the marriage is voidable merely, it is valid for civil purposes until its nullity has been pronounced by a competent court, which may be done only during the lifetime of the parties, the marriage being good *ab initio* after the death of either of the parties for all purposes. Under the codifications of the civil law it is provided that, where a void marriage has been contracted in good faith, the party or parties who have acted in good faith, and their issue, are entitled to civil rights.

''The so-called void marriage cannot be validated by a ratification by the parties, but the rule is otherwise in the case of voidable marriages.''

As may be seen, the tendency of the American jurisprudence is to uphold the integrity of the marriage in all cases of incapacity where the effect thereof is only to make the marriage voidable. If time or subsequent circumstances cure the incapacity or make it inexistent, the marriage becomes valid. Marriages contracted by minors may afterwards be validated. Some authorities admit that minors

who were not in the full enjoyment of their discretion at the time of contracting marriage may ratify it when attaining such discretion. Even within the prohibition, as a penalty imposed subsequent to a divorce, to contract a second marriage, the authorities have held, as an illustration:

"But even where a marriage is regarded as an absolute nullity, because contracted within the prohibited time after divorce of one of the parties, if there was a formal marriage and the parties continued to live together as husband and wife after the removal of the impediment, the marriage may be regarded as valid, this conclusion usually being based upon the theory either that a common-law marriage has been consummated, or that there is an unrebutted presumption of marriage." L.R.A. 1916 C, p. 752.

The Spanish Civil Code provided in section 50, notwithstanding the prohibition contained in section 45, *supra,* that if two persons married within that prohibition their marriage was valid and as a consequence of such violation provided only certain rules establishing the absolute separation of property between the parties and that neither of the spouses could receive from the other anything whatever either as a donation or inheritance. It is true that this provision was omitted in our new Code where it is provided in section 178 that "When a marriage has not been contracted according to the requirements of this Code, the same is null and void." Section 130 deals with these requirements in general and reads as follows:

"The requisites for the validity of a marriage are:
"1. The legal capacity of the contracting parties.
"2. Their consent.
"3. Authorization and celebration of a matrimonial contract according to the forms and solemnities prescribed by law."

Sections 131, 132 and 133 mention certain incapacities for contracting marriage and among them is to be found the one alleged in this action. As we have stated, an examination thereof will show that not all of them produce the nullity *ab initio* of the marriage. It would be a violation of the

spirit of section 178 if it were held that the prohibition imposed on a widow or on a woman who has deen divorced or whose marriage has been pronounced dissolved during the term fixed by law is an essential requisite to contract marriage. We think that this is a case of an impediment depending on a contingent fact which from its nature would make it impossible to uphold, under the circumstances occurring therein, and having in mind the general principles of law and equity, that it could produce the nullity *ab initio* of the marriage. In the case of *Cabassa* v. *Nadal,* 23 P.R.R. 691, the contingent fact of the impediment was existing at the time of the application for the nullity of the divorce. The complaint was filed within the 301 days from the judgment granting the divorce to the plaintiff; the danger sought to be avoided by the law existed and not even the action of time together with other circumstances had validated the marriage of the parties. That case is different and is not applicable.

It is proper to say that as the trial judge held that the facts of the cross-complaint had been proven as to the abandonment and adultery of the plaintiff and as no statement of the case or transcript of the evidence has been sent up, although for the reasons stated the judgment appealed from should be reversed and another rendered dismissing the complaint; on the other hand and in connection with the cross-complaint, the case must be remanded for further proceedings not inconsistent with this opinion.

Mr. Justice Hutchison took no part in the decision of this case.